IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA 23-734

Filed 20 August 2024

Iredell County, No. 20 CRS 1363

STATE OF NORTH CAROLINA

       v.

BLAINE DALE HAGUE

Appeal by Defendant from a judgment entered 9 December 2022 by Judge David L. Hall in Iredell County Superior Court. Heard in the Court of Appeals 15 May 2024.

> *Attorney General Joshua H. Stein, by Assistant Attorney General Jeremy D. Lindsley, for the State.*
>
> *Sandra Payne Hagood, for Defendant.*

WOOD, Judge.

Blaine Dale Hague ("Defendant") appeals from a jury verdict finding him guilty of first-degree murder for which he was sentenced to life in prison without parole. Defendant argues the trial court erred (1) by denying his motion to dismiss the first-degree murder charge, (2) by omitting the stand-your-ground provision from the jury instructions when it instructed on self-defense, and (3) by excluding certain evidence that was relevant to his claim of self-defense. For the following reasons, we reverse, vacate and remand to the trial court for a new trial.

## I.    Factual and Procedural Background

On the morning of 7 September 2020, Tommy Cass ("Tommy") had plans to dove hunt with a group of people, namely: Thomas Cass ("Thomas"), Tommy's son; Don White ("Don"); Grant Evans ("Grant"); and Brent Cass ("Brent"). Tommy told the group to meet him at Bonnie Campbell's cornfield ("the field"), a location where he had written permission from the owner, Bonnie Campbell, to hunt on the "lower field" of the property. The field extends alongside Toby's Footlog Road. Defendant and his wife own fifty acres of property on Toby's Footlog Road adjacent to the field. Defendant and his wife use the property as their primary residence and operate it as a horse rescue farm. Their home is positioned on the property approximately 100 yards from the field in which Tommy and the group had gathered to hunt.

Defendant was aware that Tommy hunted on the property. A few years earlier, around 2017, Tommy had been with a group of hunters in the field when one of Defendant's rescued horses had been shot twice by a dove hunter. Tommy told Defendant he did not know the man who shot the horse. Following the incident, Defendant asked Tommy to be more cautious and not to hunt too close to the fence line because one of his horses had been shot and because the gun fire spooked the horses. Defendant regarded their conversation as a civil encounter and characterized his relationship with Tommy as "[they] had a pretty good rapport."

According to Defendant, they would generally acknowledge one another when Tommy was hunting in the field. Additionally, Defendant had run into Tommy at a

Subway. He recalled Tommy making aggressive comments and having a "bad-day attitude," but not directed toward Defendant personally. Tommy's wife, Karla, testified that about a week prior to 7 September 2020, he had told her that Defendant approached him at a 7-Eleven saying that he was not allowed to hunt on the field anymore. Karla claimed Tommy took that conversation as a "joke" and "basically laughed it off."

On the day of the hunt, Grant, Brent, and Don arrived at the field at approximately 6:00 or 6:30 a.m. Tommy arrived shortly thereafter. While waiting for the sun to come up, the group stood around their vehicles engaged in conversation. According to Grant, Tommy started talking about Defendant saying that he was an "asshole." Don testified that during the conversation Tommy informed them that "there was an old man that would come and give him a hard time about hunting, but he would usually tell him that we had permission, and [Defendant] would just leave, and everything would be alright." Don claimed the group laughed it off since Defendant had not given Tommy any trouble previously. Brent did not remember the specific conversation that took place that morning, but Don and Grant said Tommy did not appear to be angry when he spoke about Defendant.

That morning, Defendant woke up to the sound of gunshots and horse hooves pounding on the ground. Before heading outside to calm the horses, Defendant put his gun in his back pocket as he usually did. Defendant testified it has been "automatic for [him] for the last 50 years." As Defendant drove on Toby's Footlog

Road, Thomas was arriving to meet the group. Thomas testified Defendant's vehicle cut him off as he was approaching the entrance to the field. Thomas parked next to Defendant's truck at the parking area near the field. They both exited their vehicles. Thomas testified that Defendant asked if he was there with Tommy. Thomas claimed Defendant appeared to be angry and upset; Defendant denied this exchange occurred. Thomas testified he told Defendant that they had permission from Bonnie Campbell to hunt in the field and that Defendant replied "[the group] didn't have permission to shoot his horses." Thomas then returned to his vehicle to call his father, Tommy, to alert him that Defendant was walking onto the field. During this call, Tommy said to Thomas, "that's fine" and "we have permission to be [here]."

At some point, Defendant encountered Brent and asked him to move from the fence line because the horses were spooked. While Brent was talking to Defendant, Tommy shot two doves nearby. Brent informed Defendant that the shots he had heard earlier were from a different group of dove hunters because no one from their group had fired until just then. Grant and Don testified that the earlier shots had come from another nearby field. Brent reiterated to Defendant that the group was with Tommy, who had permission to be on the field, to which Defendant replied "oh, I know Tommy" and proceeded to walk in Tommy's direction.

As Defendant approached, Tommy rose from where he was sitting and walked to meet him. Grant, Don, and Brent testified that Tommy's hands were empty as he approached Defendant and Don stated that he saw Tommy put his gun down before

he started walking. Don testified that Tommy was walking fast and appeared mad, and Grant testified Tommy seemed to be aggravated. Defendant and Tommy continued towards one another until they were about two or three feet apart, almost "face to face." Tommy then stated "every time I come over here hunting you come over here f\*\*king with me."

Tommy then pushed Defendant with both open hands causing Defendant to fall flat of his back onto the ground. Brent, Grant, and Don observed Tommy just stand there after pushing Defendant down. Defendant was almost seventy-two years old; Tommy was forty-six years old. Defendant testified that he struggled to get up from the ground because he was using a cane, had a leg boot on, had two bad legs, and had a torn Achilles tendon on his left leg. Defendant testified it took him around ten seconds to get up from the ground. Don and Grant testified Defendant got up fast, after only a few seconds.

After Defendant stood up, the testimony of what occurred immediately after diverges. Defendant testified that Tommy had walked approximately twenty feet away when Defendant said, "[t]his is a classic felony, assault on a disabled veteran and senior citizen." Defendant stated then Tommy spun around, started coming at him, appeared extremely angry, and said something to the effect of "I'm done with you." Defendant alleged Tommy then did the following:

> He -- well, when he was coming back at me, he grabbed this
> vest that he had with his left hand. He stuck his right hand
> inside the pocket area of the vest, right here, and was

rummaging around.

So I -- automatically, I looked up at his eyes. And he was coming at me full-steam. And at that second, I knew I was going to die. And fear ran through me that I have never felt since Vietnam.

And the thought of the gun didn't even go into my mind until he kept coming on me so quick. And when that hand was in that vest, that's when it dawned on me I had a weapon for defense.

I can't even tell you that I remember pulling the weapon. It happened that quick. When I came up, I came off so quick to where I was -- I didn't stretch out my arm because by the time I shot -- and that's why, if you heard the testimony by the doctor, the bullet entered underneath the left eye. And it went up in an upward motion because I came up like so.

From Defendant's perspective he shot Tommy to "defend" himself, and according to him, even as Tommy hit the ground after being shot, "his hand was still inside the vest."

Grant offered contradictory testimony during the prosecutor's questioning:

Q. How long was he standing before he pulled the gun out?
A. As soon as he got up.
Q. Just as soon as he got up?
A. As soon as he got up, he raised his arm.

Q. Okay. If I heard you correctly, Dale gets up and you're saying that he extends his right arm, correct? And you can see the gun from where you're at?
A. Right.
Q. If I heard you right, you just said you could hear Tommy say something. What did Tommy say?
A. He put his hands up and said, "no."
Q. Is that all? That's it? Just the word "no"?
A. Whoa, wait a minute, wait a minute. Bang, and he shot.

- 6 -

Don testified that "as [Defendant's] knees were straightening up, his arm came up in a motion. And I said no, no, and about that time I heard the gunshot." However, Don was unable to see the gun from his point of view, and testified that he said "no, no" because he was familiar with the movement for a handgun. Brent testified that as Defendant was getting up from the ground, he heard Don or Grant holler, turned toward them, and then heard "bang." Testimony was inconsistent as to whether Tommy reached his hand inside his vest and whether Defendant's arm was fully extended or not.

Afterwards, brief exchanges occurred between Defendant and the witnesses. Ultimately, Defendant returned to his truck and left the field. On his way out, he gave Grant his name and told him that he was going home to notify law enforcement. Defendant told his wife what had happened, unloaded his gun, set it on the picnic table, and then called law enforcement. Grant and Thomas also called 911.

During Defendant's call to law enforcement, he told the dispatcher his account of what had happened. His testimony at trial was consistent with his account of events to the dispatcher. He stated that he was disabled, unable to protect himself, and that "[he] had no choice." Further, he told the dispatcher that he advised Tommy's friends to stay away from Tommy's body because he had a gun in his vest.

Grant, Don, and Brent testified they did not touch Tommy's body or remove anything from the area. Grant and Don further testified they did not see Tommy

with any gun that day other than the one with which he was hunting. State Bureau of Investigation Special Agent Williams Waugh, ("Agent Waugh"), assisted with the investigation of the scene that day. He found a note signed by Bonnie Campbell in Tommy's pocket which stated, "Tommy Cass has permission to hunt in [the] lower field." Agent Waugh did not find any weapons on or near Tommy's body other than his shotgun, which was 121 feet from his body. Agent Waugh recovered a pill grinder, five white round pills, two marijuana joints, and a lighter in his jacket. Additionally, he observed that there were no pockets on the chest area of Tommy's jacket and that it was zipped up to his neck.

On 30 September 2020, Defendant was indicted for first-degree murder. Defendant's case came on for trial at the 5 December 2022 session of Iredell County Superior Court. At a pre-trial hearing, the court heard the State's motion in limine to exclude improper character evidence related to Tommy's prior convictions. Tommy had two previous felony convictions: possession of cocaine in 2005 and assault inflicting serious bodily injury in 2009. Since Defendant intended to argue self-defense, defense counsel asserted his knowledge of Tommy's prior convictions should be admissible to show the reasonableness of Defendant's fear of Tommy. The State argued that Defendant did not know Tommy was a felon, and if he did, Defendant did not know what his convictions were. Defendant contended that while he did not know what Tommy's convictions were, he was aware that Tommy was a felon, and that because he was a felon, he was not allowed to possess a firearm but did anyway. The

trial court noted that knowledge of a felony conviction has "little to do with the law of self-defense" but, it did not rule on the motion until Defendant decided to testify.

Once Defendant decided to testify, the trial court ruled on the State's motion in limine. The trial court granted the State's motion, explaining:

> But that would go back to the general rule that character evidence is generally impermissible to offer evidence of a person's character to show that the person acted in conformity therewith.
>
> In other words, he was a bad fellow. He was a felon. He must have been the aggressor here because he's a bad fellow because he had been convicted of a felony or, because he is a felon, he shouldn't have been carrying a gun. Those things in my view are probative of nothing.
>
> So that simply -- the fact that he -- this alleged victim was a felon and could not possess a firearm, just doesn't have any evidentiary value.

Thus, Tommy's prior convictions and testimony related to those convictions were excluded. The State also objected to the jury hearing the portions of Defendant's 911 call that related to Tommy's convictions. The trial court redacted statements from the 911 call to prevent the jury from hearing Defendant's statement about Tommy's status as a convicted felon.

At the close of the State's case, Defendant moved to dismiss the charges for insufficiency of the evidence as relates to premeditation and deliberation. The trial court denied the motion. Defendant renewed his motion at the close of all evidence, which was also denied. At the charge conference, Defendant objected to the trial

court's refusal to include the stand-your-ground doctrine in the self-defense instructions to the jury. On 9 December 2022, Defendant was convicted of first-degree murder, and sentenced to life without parole. Defendant gave notice of appeal in open court.

## II.   Analysis

Defendant raises three issues on appeal. Defendant first argues that the trial court erred when it denied his motion to dismiss the charge of first-degree murder because the State failed to present substantial evidence on premeditation and deliberation. Defendant next contends the trial court erred by omitting the stand-your-ground provision from its instructions on self-defense to the jury. Lastly, Defendant contends that the trial court erred when it excluded evidence of Tommy's felony convictions, because it was crucial to his claim of self-defense. We consider each of Defendant's arguments in turn.

### A. First-Degree Murder

We review the trial court's denial of Defendant's motion to dismiss the charge of first-degree murder *de novo. State v. Smith*, 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007) (citation omitted). "When ruling on a defendant's motion to dismiss, the trial court must determine whether there is substantial evidence (1) of each essential element of the offense charged, and (2) that the defendant is the perpetrator of the offense." *Id.* (citations omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v.*

*Cummings*, 46 N.C. App. 680, 683, 265 S.E.2d 923, 925 (1980) (citations omitted).

When reviewing a motion to dismiss, the evidence is viewed in the light most

favorable to the State, and the State is given "every reasonable intendment and every

reasonable inference to be drawn therefrom." *State v. McKinney*, 288 N.C. 113, 117,

215 S.E.2d 578, 581 (1975). Furthermore, "[c]ontradictions and discrepancies are for

the jury to resolve and do not warrant nonsuit. If there is substantial evidence to

support a finding that the offense has been committed and that defendant committed

it, a case for the jury is made and nonsuit should be denied." *Cummings*, 46 N.C. App.

at 683, 265 S.E.2d at 925 (citations omitted).

"First-degree murder is the unlawful killing – with malice, premeditation and

deliberation – of another human being." *State v. Simonovich*, 202 N.C. App. 49, 53,

688 S.E.2d 67, 70-71 (2010) (citation omitted). Our Supreme Court defines the

elements as:

> Premeditation and deliberation are processes of the mind which are generally proved by circumstantial evidence. Premeditation means that [the] defendant formed the specific intent to kill the victim for some length of time, however short, before the actual killing. Deliberation means that the defendant formed the intent to kill in a cool state of blood and not as a result of a violent passion due to sufficient provocation. Specific intent to kill is an essential element of first degree murder, but it is also a necessary constituent of the elements of premeditation and deliberation. Thus, proof of premeditation and deliberation is also proof of intent to kill.

*State v. Chapman*, 359 N.C. 328, 374, 611 S.E.2d 794, 827 (2005) (cleaned up).

"Premeditation requires proof of the *time* when the intent to kill was formed, and deliberation requires proof of the defendant's *emotional state* when he formed this intent." *State v. Smith*, 92 N.C. App. 500, 504, 374 S.E.2d 617, 620 (1988).

When considering the circumstances, this Court has outlined factors which assist in the determination of whether premeditation and deliberation were present at the time of the killing. These factors include: (1) want of provocation on the part of deceased; (2) the conduct of defendant before and after the killing; (3) threats and declarations of defendant before and during the course of the occurrence giving rise to the death of deceased; (4) the dealing of lethal blows after deceased has been felled and rendered helpless; (5) the nature and number of the victim's wounds; (6) whether the defendant left the deceased to die without attempting to obtain assistance for the deceased; (7) whether he disposed of the murder weapon; and (8) whether the defendant later lied about what happened. *State v. Horskins*, 228 N.C. App. 217, 222, 743 S.E.2d 704, 709 (2013) (cleaned up). These factors are assessed under the totality of the circumstances, rather than by giving weight to any one single factor. *State v. Walker*, 286 N.C. App. 438, 442, 880 S.E.2d 731, 736 (2022) (citations omitted).

Defendant requests this Court to vacate the first-degree murder conviction on the grounds of insufficient evidence of premeditation and deliberation, as held in *State v. Corn* and *State v. Williams*. *State v. Corn*, 303 N.C. 293, 298, 278 S.E.2d

221, 224 (1981); *State v. Williams*, 144 N.C. App. 526, 530-31, 548 S.E.2d 802, 805-06 (2001). In *Corn*, the victim, who was "highly intoxicated", went into the defendant's home and insulted the defendant as he was lying on the couch. The defendant "immediately jumped from the sofa," grabbed his gun normally kept near the sofa then shot the victim multiple times in the chest. *Corn*, 303 N.C. at 297-98, 278 S.E.2d at 223-24. Subsequently, the defendant walked across the street to his sister's house, called the police, and returned home to await the arrival of the police. In light of these facts, our Supreme Court held that the shooting was sudden, brought on by provocation by the victim, and the altercation lasted "only a few moments"; the defendant did not "exhibit any conduct which would indicate that he formed any intention to kill [the victim] prior to the incident"; the defendant and victim did not have "a history of arguments or ill will"; and no shots were fired after the victim fell. *Id.* at 298, 278 S.E.2d at 224. The Court concluded that since the defendant killed the victim "without aforethought or calm consideration", the evidence was insufficient to prove the requisite elements of premeditation and deliberation. *Id.*

In *Williams*, the defendant and victim were observing a fight in the parking lot of a nightclub. *Williams*, 144 N.C. App. at 527, 548 S.E.2d at 803. After a verbal altercation between the victim and the defendant, the victim "punched defendant in the jaw" then, "[d]efendant produced a handgun and fired a shot which struck [the victim] in the neck." *Id.* at 527, 548 S.E.2d at 803-04. Considering these factors,

this Court concluded that there was no evidence the two individuals knew each other prior to the altercation, there was no "animosity" or "threatening remarks", and the defendant was provoked by the victim's assault, leading to the defendant immediately firing one shot. *Id.* at 530-31, 548 S.E.2d at 805. Further, the "defendant's actions before and after the shooting did not show planning or forethought on his part" as he left immediately but turned himself into the police the next day. *Id.* at 531, 548 S.E.2d at 805.

In the present case Defendant argues, as in *Corn* and *Williams*, that he did not have a history of arguments, ill will, or serious animosity towards Tommy. Defendant points to his testimony that after Tommy assaulted him, he was in fear for his life because he thought Tommy was reaching for a gun. Moreover, Defendant argues he shot Tommy once immediately following the assault, indicating a reaction to being assaulted, rather than a prior plan or intention to kill him. Lastly, Defendant contends his actions after the shooting did not show "planning or forethought" because he called law enforcement to report what had happened and waited for their arrival at his home. We agree.

We note that whether Tommy reached inside his vest attempting to locate a gun, as Defendant testified, or whether Tommy simply stood there, as the witnesses testified, are "discrepancies [ ] for the jury to resolve." *Cummings*, 46 N.C. App. at 683, 265 S.E.2d at 925. Thus, we evaluate, in the light most favorable to the State, whether there is substantial evidence of both premeditation and deliberation, to the

exclusion of conflicting evidence which is contemplated by the jury. *Id*. First, as in *Corn*, the shooting was sudden, Defendant was provoked by Tommy's assault and yelling, and the altercation was brief. *Corn*, 303 N.C. at 298, 278 S.E.2d at 224. Further, Defendant shot Tommy once, without any "calm consideration," in reaction to being pushed to the ground. *Id.* Similarly, as in *Williams*, Defendant's actions "after the shooting did not show planning or forethought." *Williams*, 144 N.C. App. at 531, 548 S.E.2d at 805. Following the shooting, Defendant left the scene, drove the short distance home, left his weapon on the picnic table outside of his house, and immediately called law enforcement for assistance. Additionally, Defendant gave Grant his name as he was leaving and informed him, he was going to meet law enforcement himself.

The State argues certain interactions that occurred between Defendant and Tommy prior to the incident demonstrated a "history of animosity" between the two. The State directs us to the following: a conversation a few years prior after Defendant's horse was shot by an individual in Tommy's hunting group; an interaction at a Subway; and Karla's testimony that Defendant told Tommy he could no longer hunt on the property. At trial, Defendant testified he and Tommy had a "pretty good rapport" and had "never had an argument" or previously fought. There was no contradictory testimony by any of the other witnesses. Don testified he and Tommy joked about Defendant giving Tommy a hard time about hunting, but that Defendant "usually left" and "never gave him no trouble." Grant and Don

testified Tommy seemed normal, not angry, when speaking about Defendant on the day of the hunt. As to the conversation about which Karla testified, she stated Tommy took that conversation as a joke, that it was nothing serious, and he was not angry at Defendant. Lastly, Defendant did not threaten Tommy or make any statements of a violent nature.

We disagree that these encounters rise to the level of a "history of arguments or ill will." *Corn*, 303 N.C. at 298, S.E.2d at 224. First, the conversation about Defendant's horse being shot by a dove hunter occurred a few years earlier, and Tommy had hunted on the field numerous occasions since without further incident. Second, their encounter at Subway occurred approximately one year earlier and their conversation did not concern their relationship.

Furthermore, upon consideration of the eight factors enumerated by this Court, we are unable to conclude under the facts of this case that premeditation and deliberation were met. *Horskins*, 228 N.C. App. at 222, 743 S.E.2d at 709. The uncontroverted evidence showed Tommy provoked Defendant, an injured 72-year-old man, by yelling at him and pushing him to the ground, and the evidence further demonstrated that it had been Defendant's "habit" since serving in the Vietnam war to carry his gun when leaving the house. The State asserts that "arriving at the scene of a murder with a weapon supports an inference of premeditation and deliberation." *State v. Hicks*, 241 N.C. App. 345, 355, 772 S.E.2d 486, 493 (2015) (cleaned up). We cannot agree. Defendant did not threaten Tommy before or

during their interaction leading to the shooting. Defendant did not approach Tommy's body nor attempt to tamper with anything at the scene. Tommy was shot once. Defendant did not deal additional lethal blows after Tommy had fallen to the ground. Defendant left the scene to call law enforcement although aware that others present were also calling for assistance. Defendant did not dispose of his gun, rather he unloaded it, placed it on the picnic table and directed law enforcement to it upon their arrival. Although the witnesses' testimony conflicted at trial, Defendant's statements in his 911 call were consistent with his testimony at trial. Defendant did not attempt to lie about killing Tommy or conceal any facts to law enforcement. Under the totality of the circumstances, giving equal weight to all factors, we are unable to hold Defendant's conduct met the threshold of premeditation and deliberation. *Walker*, 286 N.C. App. at 442, 880 S.E.2d at 736.

The dissenting opinion concludes that there is sufficient evidence of premeditation and deliberation, in relevant part, because the parties had a history of arguments and ill will. When drawing such conclusion, the dissent focuses on a confrontation between Defendant and Tommy at a Subway; that Tommy was hunting on the same property when Defendant's horse had been shot; and the conversation between Defendant and Tommy at a 7-Eleven, when Defendant told him that he could not hunt on the property.

First, Defendant and Tommy's conversation at Subway occurred approximately one year prior. Defendant stated that while in the store, Tommy was

making comments about judges, attorneys, and cops, and it seemed like he was having a bad day. The conversation ended with Defendant patting Tommy on his shoulder and saying "[h]ave a good day. Be careful out there," and Defendant exiting the store. This interaction does not rise to the level of "confrontation" and there is no evidence to indicate otherwise. Second, although the dissent is correct that Tommy was hunting on the same property where Defendant's horse had been shot by someone in Tommy's hunting party, it occurred several years prior. As noted previously, Tommy subsequently hunted on the field without the parties having any further issues. Lastly, in response to Defendant telling Tommy that he could not hunt on the field during their interaction at 7-Eleven, Karla, Tommy's wife, testified that he "basically laughed it off." These interactions cannot amount to ill will or animosity between the parties, as Defendant did not communicate any threatening remarks and generally, Defendant "never gave [Tommy] no trouble, just a hard time" about hunting on the field.

For these reasons, taken in the light most favorable to the State, the evidence is insufficient to prove the requisite elements to support a conviction of first-degree murder. *Cummings*, 46 N.C. App. at 683, 265 S.E.2d at 925. Accordingly, Defendant's conviction of first-degree murder must be reversed and vacated.

## B. Jury Instructions

Defendant next argues the trial court erred in omitting the stand-your-ground doctrine from the jury instructions. "[T]he trial court's decisions regarding jury

instructions are reviewed *de novo* by this Court." *State v. Edwards*, 239 N.C. App. 391, 393, 768 S.E.2d 619, 621 (2015) (citation omitted). "A trial court must give the substance of a requested jury instruction if it is correct in itself and supported by the evidence." *State v. Williams*, 283 N.C. App. 538, 542, 873 S.E.2d 433, 436–37 (2022) (cleaned up). "However, an error in jury instructions is prejudicial and requires a new trial only if 'there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises.'" *State v. Castaneda*, 196 N.C. App. 109, 116, 674 S.E.2d 707, 712 (2009) (citation omitted). A defendant has the burden of establishing prejudice. *Id.* (citation omitted).

At the charge conference, Defendant objected to the omission of the stand-your-ground doctrine from the self-defense instruction of the jury charge. The trial court reasoned:

> [T]he evidence is as follows, the defendant lived on an adjacent, or a pertinent, tract of land. All the evidence, including that of the defendant is that the defendant went on this land owned by a Campbell, and then Bonnie Campbell, as a tenant in common, being the wife of the other gentleman. The alleged victim had written permission from the landowner.
>
> There's no evidence that one way or another that the defendant had permission to be on the property, but it's worthy to note that it was not the defendant's property, it was not his home, it was not his place of business, it was not a common area, and it was not public property.

Defendant argues pursuant to N.C. Gen. Stat. § 14-51.3, he was entitled to the stand-

your-ground instruction. Under the statute, "a person is justified in the use of deadly force and does not have a duty to retreat in any place he or she has the lawful right to be" if "[h]e or she reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself." N.C. Gen. Stat. § 14-51.3. Thus, "one who is not the initial aggressor may stand his ground, regardless of whether he is in or outside the home" and therefore has no duty to retreat. *State v. Lee*, 370 N.C. 671, 675 n.2, 811 S.E.2d 563, 566 n.2 (2018).

Defendant's argument as to these instructions centers on whether Defendant shot Tommy at a place he was lawfully allowed to be. He argues (1) the court erred in finding that he was not entitled to the instruction because he was not in his home, workplace, or motor vehicle; and (2) the trial court erroneously assumed that a person who has not been given explicit permission to be on the land of another cannot be present there lawfully. Defendant urges this Court to hold that "a person who is merely somewhere he or she has a lawful right to be has the same right to stand his ground and not retreat as a person in his home, workplace, or motor vehicle." Further, Defendant argues he was prejudiced by the omission of the instruction because the reasonableness of his actions is intertwined with whether he had a duty to retreat and had the jury understood that he had no duty to retreat, but could stand his ground, he likely would have been acquitted based on self-defense.

It is undisputed that Defendant shot Tommy in a field located on property owned by Bonnie Campbell. There is no evidence that Defendant had a lawful right

to be on this *privately owned* property. Defendant contends however, that absent evidence that he was a trespasser, he had a lawful right to be in the field and there is no reason to assume he was there unlawfully. We disagree.

Defendant's argument is contradicted by our case law which establishes the circumstances in which the individual had a *lawful right to be* in the respective place. For example, in *Lee*, our Supreme Court held the defendant could stand his ground while standing in a public street, a place where he had a lawful right to be. *Lee*, 370 N.C. at 675-76, 811 S.E.2d at 567. In *Irabor*, this Court held the defendant was entitled to a stand-your-ground instruction when he shot the victim while standing outside the door to his apartment. *State v. Irabor*, 262 N.C. App. 490, 496, 822 S.E.2d 421, 425 (2018). In *Ayers*, this Court held "[the] [d]efendant was present in a location he lawfully had a right to be: driving inside his vehicle upon a public highway." *State v. Ayers*, 261 N.C. App. 220, 228, 819 S.E.2d 407, 413 (2018). Here we cannot conclude Defendant had a lawful right to be on *privately* owned property, absent evidence sufficient to establish that he had the lawful right to be in the field on property he did not own. Defendant failed to present any evidence that the owner of the field had given permission for him to be in the field that day or any other day. In contrast, the State presented evidence that Tommy had written permission from the owner to hunt in the field on the day he was killed.

Assuming *arguendo*, the trial court erred by omitting the instruction, Defendant was not prejudiced by its omission. The trial court instructed the jury as

follows:

> The defendant would be excused of first-degree murder and second-degree murder on the ground of self-defense if first, the defendant believed it was necessary to kill the victim in order to save the defendant from death or great bodily harm.
>
> And second, the circumstances as they appear to the defendant at the time, were sufficient to create such belief in the mind of a person of ordinary firmness. In determining the reasonableness of the defendant's belief, you should consider these circumstances as you find them to have existed from the evidence presented, including the size, age, strength of the defendant as compared to the victim, the fierceness of the assault, if any, by the victim upon the defendant, whether the victim had a weapon in the victim's possession at the time he was killed. The defendant would not be guilty of any crime if the defendant acted in self-defense, if the defendant did not use excessive force under the circumstances.
>
> A person is also justified in using defensive force when the force used by the alleged victim was so serious that the defendant reasonably believed that he was in imminent danger of death or serious bodily harm and the defendant had no reasonable means to retreat. And the use of force likely to cause death or serious bodily harm was the only way for the defendant to escape the danger.
>
> A defendant does not have the right to use excessive force. A defendant uses excessive force if the defendant uses more force than reasonably appeared to the defendant to be necessary at the time of the killing. It is for you, the jury, to decide the reasonableness of the force used by the defendant under all of the circumstances as they appeared to the defendant at the time.

Under the stand-your-ground doctrine, a defendant is permitted to "use deadly force

against the victim under Subsection 14-51.3(a) *only* if it was necessary to prevent

imminent death or great bodily harm, *i.e.*, if it was proportional." *Walker,* 286 N.C. App. at 449, 880 S.E.2d at 739. Thus, "the proportionality rule inherent in the requirement that the defendant not use excessive force continues to exist even in instances in which a defendant is entitled to *stand his or her ground*." *State v. Benner*, 380 N.C. 621, 636, 869 S.E.2d 199, 209 (2022) (emphasis added).

Here, the trial court provided the jury with the excessive-force instruction and the reasonableness of such force. The trial court also instructed the jury to contemplate the "size, age, strength of the defendant as compared to the victim, the fierceness of the assault, if any, by the victim upon the defendant, [and] whether the victim had a weapon in the victim's possession at the time he was killed." In other words, the trial court instructed the jury to evaluate the proportionality between the degree of force and the surrounding circumstances. Thus, the jury implicitly decided that Defendant's use of force was not proportional by declining to find that Defendant acted in self-defense. Further, the record contains substantial evidence from which a reasonable jury could have concluded that Defendant used excessive force when he shot Tommy. Accordingly, even if the trial court erred by omitting the instruction, Defendant failed to establish "a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial." *Benner*, 380 N.C. at 636, 869 S.E.2d at 209 (citation omitted).

## C. 404(b) Evidence of Prior Convictions

Defendant next argues the trial court erred by excluding testimony concerning

Tommy's prior convictions. "We review *de novo* the legal conclusion that the evidence is, or is not, within the coverage of Rule 404(b). We then review the trial court's Rule 403 determination for abuse of discretion." *State v. Beckelheimer*, 366 N.C. 127, 130, 726 S.E.2d 156, 159 (2012). The defendant is tasked with the burden of proving "a reasonable possibility that, had the error not been committed, a different result would have been reached at trial." *State v. Scott*, 331 N.C. 39, 46, 413 S.E.2d 787, 791 (1992) (citation omitted). As discussed *supra,* the trial court excluded the evidence on the basis that "character evidence is generally impermissible to offer evidence of a person's character to show that the person acted in conformity therewith." The trial court opined that evidence that Tommy was a felon, and therefore could not legally possess a firearm, would lead the jury to conclude he was a "bad fellow" and "must have been the aggressor." Further, the trial court found "[a] criminal conviction of an alleged victim may be introduced if the defendant had knowledge of the conviction at the time of the fatal encounter . . . pursuant to [Rule] 404(b)" and, "being aware that one is a felon is simply not going to pass evidentiary muster."

Here, the trial court contemplated the exclusion of the evidence under Rules 404(a)(2) and 404(b). Rule 404(a) provides, "evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion." N.C. Gen. Stat. § 8C-1, Rule 404. However, Rule 404(a)(2) provides an exception to the general rule and allows a party accused of a criminal offense to offer evidence of a pertinent character trait of the

victim. *Id.* Rule 404(a)(2).  It provides that the following evidence is admissible:

> Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor[.]

*Id.*  Under this Rule, the trial court excluded the evidence based on a finding that Defendant offered it to prove that Tommy was the initial aggressor and to prove a particular character trait of Tommy.  Alternatively, Rule 404(b) states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

*Id.* Rule 404(b).  Here, the trial court excluded the evidence because Defendant did not know what Tommy's prior convictions were.

Defendant argues that under Rule 404(b) the evidence should have been admitted, not to prove that Tommy had a propensity for violence, but that Defendant's knowledge that Tommy was a convicted felon was relevant to the reasonableness of Defendant's fear.  Defendant contends that knowing that Tommy was a convicted felon, and thus was more afraid of him, was essential to his claim of self-defense.  Defendant concedes he did not know the "exact nature" of Tommy's prior convictions; however, because he knew of Tommy's "status" as a convicted felon, the evidence was relevant for the jury when analyzing Defendant's state of mind at the

time he killed Tommy.

In *Jacobs*, our Supreme Court analyzed a similar admissibility issue. *State v. Jacobs*, 363 N.C. 815, 689 S.E.2d 859 (2010). The Court explained:

> Defendant's proposed testimony that he knew of certain violent acts by the victim and that the victim's time in prison led defendant to believe he was about to be shot, is principally pertinent to defendant's claim at trial that he shot the victim in self-defense and consequently was not guilty of first-degree murder on the basis of malice, premeditation, and deliberation. This excluded evidence supports defendant's self-defense claim in two ways: (1) defendant's knowledge of the victim's past at the time of the shooting is relevant to defendant's mental state; and (2) the light this knowledge cast on the victim's character could make it more likely that the victim acted in a way that warranted self-defense by defendant.

*Id.* at 822, 689 S.E.2d at 864. Like *Jacobs*, Defendant's proposed testimony here, that he was aware of Tommy's status as a convicted felon, and that such knowledge led Defendant to be more afraid of Tommy and believe he was going to be shot, is "principally pertinent to [D]efendant's claim at trial that he shot the victim in self-defense." *Id.* Further, with respect to self-defense, this evidence provides insight as to Defendant's state of mind at the time of the killing and an understanding as to the reasonableness of Defendant's fear and whether such fear justified his actions.

Additionally, the *Jacobs* Court clarified that such evidence would be impermissible character evidence if its only basis for admissibility was to explain the victim's behavior at the time of the incident. *Id.* at 823, 689 S.E.2d at 864. On the other hand, "because the evidence is relevant to defendant's state of mind, it is not

prohibited by Rule 404(b)." *Id.* (citation omitted). Defendant did not wish to testify about Tommy's status as a convicted felon to show Tommy had a propensity for violence or that his previous convictions were connected to his behavior that day; rather, Defendant's proposed testimony was relevant to his state of mind at the time he shot Tommy and was not prohibited by Rule 404(b).

We note North Carolina Courts have uniformly held that Rule 404(b) is a rule of *inclusion. State v. Coffey*, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990). "Rule 404(b) is a clear general rule of *inclusion* of relevant evidence . . . subject to but *one exception* requiring its exclusion if its *only* probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged." *State v. Lloyd*, 354 N.C. 76, 88, 552 S.E.2d 596, 608 (2001) (citation omitted). Therefore, "evidence of other offenses is *admissible* so long as it is *relevant to any fact or issue other than* the character of the accused." *Id.* (cleaned up). We are unpersuaded by the State's argument in support of the trial court's decision to exclude evidence of Tommy's status as a felon as the evidence presented serves a non-propensity purpose and such evidence should generally be admissible. Accordingly, the trial court erred in excluding this evidence.

If the trial court's Rule 404(b) ruling was erroneous, this Court "must then determine whether that error was prejudicial." *State v. Pabon*, 380 N.C. 241, 260, 867 S.E.2d 632, 645 (2022) (citation omitted). To determine if a 404(b) error is prejudicial, the test is "whether there is a reasonable possibility that, had the error not been

committed, a different result would have been reached at trial" and "[t]he burden of demonstrating prejudice lies with defendant." *Id.* 380 at 260, 867 S.E.2d at 645 (cleaned up). Here, Defendant has shown a reasonable possibility that the jury would have reached a different result had he had the ability to testify about his knowledge of Tommy's status as a convicted felon. At trial, the jury heard two conflicting narratives: (1) Defendant's testimony that Tommy charged at him and was reaching in his vest for what Defendant believed was a weapon; and (2) the witnesses' testimony that Tommy stood there after pushing Defendant to the ground when Defendant retrieved his weapon and shot Tommy. The excluded evidence would most certainly have provided the jury with insight into Defendant's state of mind, which is essential to his claim of self-defense, and whether Defendant's fear and degree of force was reasonable. Without this evidence, Defendant's testimony about the sequence of events that day lacks corroboration and support. Accordingly, a different result would probably have been reached at trial had the jury heard evidence related to Defendant's state of mind.

Further, the trial court's exclusion of this evidence required portions of Defendant's 911 call to be redacted, preventing the jury from hearing evidence of Defendant's state of mind. In the call, the dispatcher asked Defendant, "And y'all have had this issue before in previous years?" Defendant responded, "No. No. I've known Tommy. He's a felon. When I was a detention officer at Iredell County, he was also my neighbor at one time. And I've always known he hunts illegally, and I could

have called the law on him a million times, and I didn't." After the trial court redacted statements from the call, the jury heard, "And y'all have had this issue before in previous years?" "[H]e was also my neighbor at one time. And I've always known he hunts illegally, and I could have called the law on him a million times, and I didn't." Thus, the jury was allowed to hear that Defendant knew Tommy hunts illegally but did not have the context to understand Defendant's basis for this statement.

During the cross-examination of Agent Waugh, the State asked if a valid hunting license was found in Tommy's wallet, to which Agent Waugh responded "Yes, there was." This evidence was allowed to be presented to the jury, even though Tommy was hunting there illegally because as a convicted felon he could not *legally possess* a firearm *even with* a valid hunting license. Further, evidence that Defendant knew Tommy from when he was employed as a detention officer for the Iredell County Sheriff's office was omitted.

Additionally, at trial, the jury heard numerous times that Tommy was lawfully on the field, with written permission from the owner. This was offered through the testimony of the witnesses and the State's exhibit of the note found in Tommy's jacket that stated he had such permission. Further, other testimony was presented that revealed Defendant took issue with whether Tommy had permission and even if he did, Defendant did not want Tommy hunting on the property. Therefore, when the statements from the 911 call were excluded, the jury could only speculate as to why Defendant believed Tommy hunted illegally, likely concluding that "illegally" meant

"without permission" because they heard evidence that Tommy had a valid hunting license.

This exclusion from the 911 call likely misled and confused the jury. The State presented evidence that Tommy had a valid hunting license and written permission to be on the property. The redacted statements rebutted this evidence, providing the jury with a basis for Defendant's statements. Moreover, it could have led the jury to affirmatively conclude that Defendant did not believe Tommy had permission, when in fact his statement related to Tommy's status as a convicted felon, not Defendant's belief of whether Tommy had permission. This redaction was both error and prejudicial to Defendant. We conclude Defendant satisfied his burden of proving "a reasonable possibility that, had the error not been committed, a different result would have been reached at trial." *Scott*, 331 N.C. at 46, 413 S.E.2d at 791.

While the dissent correctly acknowledges that the trial court engaged in the Rule 403 balancing test and recognized the potential for prejudice, we disagree that the trial court did not abuse its discretion in reaching its conclusion. The dissent notes that the jury arrived at their decision after hearing all the evidence and judging the credibility of the witnesses. However, as a result of the trial court's 404(b) exclusion, the jury heard incomplete, misleading evidence, which potentially undermined Defendant's credibility and defense. Without this evidence, Defendant was unable to articulate his state of mind at the time he shot Tommy and could not explain his basis for why he believed Tommy was hunting illegally. Without this

context, the jury could have drawn incorrect conclusions, believing Defendant shot Tommy because he did not want him hunting on the land anymore and did not believe he had permission, especially when presented with Tommy's hunting license and written note of permission. Thus, this evidence was crucial for Defendant to develop his defense. When viewing the excluded evidence as it applies to each set of facts, specifically Defendant's state of mind, the redacted 911 call, and the admission of Tommy's hunting license and note, we hold the trial court abused its discretion when it reached its conclusion to exclude the Rule 404(b) evidence of Tommy's status as a convicted felon.

### III. Conclusion

We hold the trial court erred in denying Defendant's motion to dismiss the charge of first-degree murder because substantial evidence of premeditation and deliberation was not presented at trial. The trial court did not err in omitting the stand-your-ground doctrine from the jury instructions; however, the trial court erred in excluding the Rule 404(b) evidence of Tommy's status as a convicted felon. Because Defendant was prejudiced by the trial court's error, Defendant's conviction is reversed and vacated. Defendant is entitled to a new trial, and we remand to the trial court for a new trial. It is so ordered.

NEW TRIAL.

Judge HAMPSON concurs.

Judge STADING concurring in part and dissenting in part by separate opinion.

STADING, Judge, concurring in part and dissenting in part.

I concur with part B of the majority's analysis addressing Defendant's argument about the trial court's jury instructions. However, I respectfully dissent from the majority's conclusion in part A and would hold that there is sufficient evidence to survive a motion to dismiss when considering the evidence in the light most favorable to the State. I also dissent from the majority's opinion in part C and would hold that the trial court did not err by excluding the victim's status as a felon.

## I.     Motion to Dismiss

First-degree murder is a "willful, deliberate, and premeditated killing." N.C. Gen. Stat. § 14-17(a) (2023). To survive a motion to dismiss, there must be substantial evidence that the defendant intentionally killed the victim with malice, premeditation, and deliberation. *State v. Corn*, 303 N.C. 293, 296, 278 S.E.2d 221, 223 (1981) (citations omitted). "Whether an action is premeditated depends on whether thought preceded action, not the length of the thought. Further, both premeditation and deliberation are mental processes generally proven by actions and circumstances surrounding the killing." *State v. Joyner*, 329 N.C. 211, 215, 404 S.E.2d 653, 655 (1991) (citation omitted).

> In ruling on a motion to dismiss the trial court is to consider the evidence in the light most favorable to the State. In so doing, the State is entitled to every reasonable intendment and every reasonable inference to be drawn from the evidence; contradictions and discrepancies do not warrant dismissal of the case – they are for the jury to resolve. The court is to consider all of the evidence actually

> admitted, whether competent or incompetent, which is favorable to the State. The defendant's evidence, unless favorable to the State, is not to be taken into consideration.

*State v. Earnhardt*, 307 N.C. 62, 67, 296 S.E.2d 649, 652-53 (1982) (cleaned up).

Considering the evidence through the proper lens shows that the trial court did not err. Before the events of 7 September 2020, a confrontation had occurred between Defendant and the victim at a Subway. And during a prior dove season, the victim was hunting on the same property when Defendant's horse had been shot. At the time, Defendant questioned the victim about the responsible party and believed the victim's response was dishonest. Also on an earlier occasion, while at a 7-Eleven, Defendant told the victim he could not hunt on the neighboring property. On 7 September 2020, Defendant was awakened by the sounds of gunshots and horse hooves pounding. He got up, put on his clothes, placed a pistol in his back pocket, and drove to confront the hunters. Defendant exited his truck, was angry, and asked the victim's son if he was there with the victim by name. The victim's son replied in the affirmative and added that they had written permission to hunt on the property. Defendant walked towards the victim. The victim put down his shotgun and had nothing in his hands when walking to meet Defendant. The victim expressed his irritation with Defendant continually bothering him while hunting on the property. The two men exchanged words, and the victim pushed Defendant down. Defendant remained on the ground for a few seconds and then drew his gun as he got up. The victim put up his hands and said "no," but Defendant shot him from a distance of only

a few feet. The other hunters nearby also said "no" upon seeing Defendant draw his gun before shooting the victim. One of the hunters called 911 and told Defendant not to leave. Defendant walked by another hunter on the way to his car, told him to put down his gun, and nonchalantly acknowledged killing the victim. Defendant then got in his truck and returned to his home.

Viewing the evidence in the light most favorable to the State and weighing the factors noted by the majority under the totality of the circumstances shows substantial evidence was presented from which a jury could determine that Defendant intentionally shot the victim with malice, premeditation, and deliberation at the time of the killing. *See State v. Hager*, 320 N.C. 77, 82, 357 S.E.2d 615, 618 (1987); *see also State v. Olson*, 330 N.C. 557, 565, 411 S.E.2d 592, 596 (1992) ("Some of the circumstances from which premeditation and deliberation may be implied are (1) absence of provocation on the part of the deceased, (2) the statements and conduct of the defendant before and after the killing, (3) threats and declarations of the defendant before and during the occurrence giving rise to the death of the deceased, (4) ill will or previous difficulties between the parties, (5) the dealing of lethal blows after the deceased has been felled and rendered helpless, (6) evidence that the killing was done in a brutal manner, and (7) the nature and number of the victim's wounds."). Contrary to Defendant's urging, the present matter is distinguishable from *Corn*, 303 N.C. 293, 298, 278 S.E.2d 221, 224 (1981) and *State v. Williams*, 144 N.C. App. 526,

3

530-31, 548 S.E.2d 802, 805 (2001) because, among other reasons, the parties here have a history of arguments and animosity.

## II.    Evidence the Victim was a Felon

Generally, "[e]vidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except . . . [e]vidence of a pertinent trait of character of the victim of the crime offered by an accused. . . ." N.C. Gen. Stat. § 8C-1, R. 404(a) (2023). And, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." N.C. Gen. Stat. § 8C-1, R. 404(b) (2023). "It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident." *Id.* "[P]rior to admitting extrinsic conduct evidence, [the trial court is required] to engage in a balancing, under Rule 403, of the probative value of the evidence against its prejudicial effect." *State v. Morgan*, 315 N.C. 626, 640, 340 S.E.2d 84, 93 (1986). This balancing test requires the trial court to determine whether the offered evidence may be excluded because "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. . . ." N.C. Gen. Stat. § 8C, R. 403 (2023). The trial court's determination concerning admitting evidence under Rule 403 is reviewed for abuse of discretion. *State v. Beckelheimer*, 366 N.C. 127, 130, 726 S.E.2d 156, 159 (2012).

Here, the trial court found that Defendant's awareness that the victim was a felon did not permit admission of such fact before the jury under either evidentiary rule. Even so, Defendant maintains that Rule 404(b) applies, and the trial court erred in not permitting evidence that the victim was a convicted felon as it was relevant to show that Defendant was afraid of the victim. The majority analysis holds for Defendant in comparing this matter to *State v. Jacobs*, 363 N.C. 815, 689 S.E.2d 859 (2010). Yet, *Jacobs* instructs that "under Rule 403, relevant evidence may be excluded if its probative value 'is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.'" *Id.* at 823, 689 S.E.2d at 864 (citing N.C. Gen. Stat. § 8C, R. 403). And "[t]he exclusion of evidence under the Rule 403 balancing test lies within the trial court's sound discretion and will only be disturbed where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *Id.* (citation omitted). The trial court here engaged in this balancing test, noted the potential for prejudice, and determined that the evidence was "probative of nothing" and did not abuse its discretion in reaching its conclusion.

After receiving instructions from the trial court on first-degree murder, second-degree murder, and voluntary manslaughter, the jury found Defendant guilty of first-degree murder. The jury arrived at their decision after hearing all the evidence and

5

judging the credibility of the witnesses. Here, Defendant received a fair trial free from prejudicial error. Based on the foregoing, I would affirm the judgment below.